# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

LOUIS REY PEREZ, III,

                          Petitioner,

v.

UNITED STATES OF AMERICA,

                          Respondent.

Case No. 23-CV-718-JPS

**ORDER**

## 1.     INTRODUCTION

On June 2, 2023, Petitioner Louis Rey Perez, III ("Petitioner") moved to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. ECF No. 1. The Court screened the motion in accordance with Rule 4 of the Rules Governing § 2255 Proceedings, concluding that Petitioner's motion was timely and not subject to procedural default. *See generally* ECF No. 2. Petitioner's four grounds for relief all sound in ineffective assistance of counsel on the part of his trial counsel, Attorney Patrick Cafferty ("Cafferty"). *Id.* at 2. The Court understands them as follows:

(1) Violation of 6th Amendment Right to effective assistance of counsel for failing to investigate and introduce new evidence that was reliable and readily available, failure to object to governments [sic] relevant conduct of Drug amount, and failure to cross-examine Police Officers or C.I. about amount of drugs [Ground One];

(2) Ineffective assistance of counsel for not challenging 924(c)(A)(1) because [Petitioner] was never in the presence of a firearm in furtherance of a crime [Ground Two];

(3) Counsel was ineffective for violating [Petitioner's] constitutional right of due process of law under [the] 14th

Amendment because [Petitioner] was in solitary confindment [sic] for 3 months[1] . . . unable to contact counsel or obtain any legal counsel, never received a copy of plea agreement, and was pressured and unknowledgable [sic] of plea agreement [Ground Three]; and

(4) Counsel was ineffective for not filing motion to suppress for evidence in [§] 841[] controlled substance, Distribute, or Dispense because [n]o control [sic] buys were ever made by officials or DEA, no drug residue found on [Petitioner's] property or person, yet [n]o motions w[ere] filed to suppress or [to] test any drug content for purety [sic] or actuality [Ground Four].

*Id.* (internal quotation marks omitted).

After an extension of time, Respondent answered the motion, which triggered the briefing period for Petitioner's brief in support of his motion. ECF Nos. 7, 2 at 6–7. Even after a post-deadline prompting by the Court, Petitioner failed to timely file a brief in support of his motion. *See* ECF No. 8. Accordingly, the Court ordered Respondent to proceed to filing its brief in opposition. ECF No. 9. Respondent did so, although it primarily refers to and relies on its answer. ECF No. 10. The Court will now address the merits of Petitioner's § 2255 motion. For the reasons discussed herein, the Court will deny the motion and dismiss this case with prejudice.

2.     BACKGROUND

Petitioner's § 2255 motion arises from his criminal proceedings before this Court in *United States v. Louis Rey Perez, III,* 20-CR-185-1-JPS (E.D. Wis.).[2]

---

[1] It is not clear if Petitioner wrote 3 or 6 months. ECF No. 1 at 6.

[2] Docket references thereto will be cited as CR-ECF.

### 2.1 Indictment

In the fall of 2020, Petitioner was charged in an extensive multi-defendant drug trafficking and money laundering case. CR-ECF No. 1. The criminal complaint alleged that an investigation initiated in 2018 revealed that a group of individuals, including Petitioner, was involved in a large-scale drug trafficking organization ("DTO"), distributing marijuana, marijuana vape cartridges, and cocaine sourced from California. CR-ECF No. 1 at 12. The complaint identified Petitioner as "the individual spearheading the DTO" out of Milwaukee and alleged that he was in charge of distributing the marijuana and marijuana-related products to mid-level distributors of the DTO. *Id.* at 13, 15. The complaint further alleged that Petitioner regularly mailed packages containing bulk U.S. currency to California suppliers. *Id.* at 16.

A grand jury indicted Petitioner on four counts: conspiracy to possess with intent to distribute five kilograms or more of cocaine and 1,000 kilograms or more of marijuana (Count One); knowing possession of eight firearms in furtherance of the offense charged in Count One (Count Six); conspiracy to commit money laundering (Count Ten); and possession with intent to distribute 100 grams or more of heroin (Count Fourteen). CR-ECF No. 107.

### 2.2 Pre-Plea & Plea Agreement

Petitioner was arraigned in October 2020, at which time he entered a plea of not guilty. CR-ECF No. 108. This Court later set a plea deadline of December 10, 2021. CR-ECF No. 272. On December 1, 2021, Cafferty informed the Court that Petitioner intended to enter a guilty plea and that the parties were working out the details. CR-ECF No. 312.

Following an extension of time, CR-text order dated December 6, 2021, the parties signed and filed a plea agreement in which Petitioner agreed to enter pleas of guilty to Counts One and Six of the Indictment. CR-ECF No. 356.

In signing the plea agreement, Petitioner averred that he was "entering into [it] freely and voluntarily," that he was not at the time of signing under the influence of any drug or alcohol that would impair his comprehension, that Cafferty had reviewed "every part of th[e] agreement with" Petitioner and advised him of the implications of the sentencing guidelines, that Petitioner had discussed "all aspects" of his case with Cafferty, and that he was "satisfied that [Cafferty] ha[d] provided effective assistance of counsel." *Id.* at 45. The agreement also provided that Petitioner had "read and fully understood" the charges to which he was pleading guilty, that he understood the elements of those charges, that the Court would consider the Sentencing Guidelines ("U.S.S.G.") in sentencing Petitioner, and that Petitioner and Cafferty had discussed the implications of the U.S.S.G. *Id.* at 1–2, 34–35. It further provided that Petitioner understood that the Court could consider relevant conduct pursuant to U.S.S.G. § 1B1.3, even if that relevant conduct was "not the subject of the offenses to which" Petitioner was pleading guilty. *Id.* at 35–36.

In signing, Petitioner also acknowledged and agreed that he was "in fact, guilty" of Counts One and Six and that the Government could prove beyond a reasonable doubt the facts recounted in the plea agreement. *Id.* at 4. He also thereby agreed that the Government had sufficient admissible evidence to prove that he was responsible for distributing at least 3,000 kilograms of marijuana, at least 150 kilograms of cocaine, and at least three kilograms of heroin; that he possessed firearms in furtherance of his drug

trafficking; and that the parties would recommend to the Court that the relevant conduct attributable to him would track those drug quantities. *Id.* at 32, 36.

 Tracking the criminal complaint, the plea agreement provides that law enforcement identified Petitioner as the leader of the DTO. *Id.* at 4. Law enforcement identified Petitioner's then girlfriend, Xina Yang ("Xina"), as working alongside Petitioner in operating the DTO. *Id.*

Xina and Petitioner coordinated retrieval of packages containing drugs and drug proceeds, tracked drug packages' whereabouts on their phones, distributed drug products under the Brand "Midwest Connect," and mailed drug proceeds to California. *Id.* California-based co-defendants supplied Petitioner with bulk marijuana and marijuana-related products as early as January 2017. *Id.* at 5. Petitioner and Xina frequently traveled to California on behalf of the DTO. *Id.* Petitioner instructed other members of the DTO to manage distribution back in Milwaukee while he and Xina were away. *Id.*

During the investigation, law enforcement (authorized by Title III orders[3]) intercepted communications from various phones used by Petitioner and his co-defendants. *Id.* Law enforcement also intercepted communications from a Snapchat account ("Midwest_connect") used by Petitioner. *Id.* These intercepted communications confirmed that Petitioner was obtaining drugs from California and distributing them to mid-level distributors and street-level users, assisted by Xina. *Id.* Midwest_connect revealed numerous conversations regarding drug sales, as well as

---

[3]Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Wiretap Act).

photographs and videos of various kinds of drugs, lists of drug availability and pricing, and advertisement for the brand. *Id.* at 16–17. For example, at one point in April 2020, Petitioner uploaded the following to Midwest_connect: "I'm all sold out so hit me up my brothers if u wana [sic] get good Midwest Connected shit . . . ." *Id.* at 16. During the relevant period, Petitioner also received at least 200 drug packages in the mail, delivered to at least eight different addresses in the Milwaukee area, each of which was associated with at least one member of the DTO. *Id.* at 5–6.

In September 2018, Petitioner, Xina, and Petitioner's father ("Perez Jr.") were driving from California to Wisconsin on DTO business. *Id.* at 8. Xina and Petitioner drove together while Perez Jr. drove separately. Perez Jr. was stopped in Utah, at which time it was discovered that he had eight kilograms of cocaine hidden in his truck. *Id.* He was arrested for possession with intent to deliver cocaine and informed officers in a post-arrest *Mirandized*[4] statement that he had been in California and that Petitioner and Xina had gone there with him. *Id.* Before Perez Jr. was stopped and arrested, he had been communicating with Xina and Petitioner with pre-paid phones. *Id.* Perez Jr. told law enforcement that Petitioner had purchased the pre-paid phone for him. *Id.* Notably, on the day after the traffic stop, Petitioner cancelled a phone number that he had activated the previous year, and he established a new number. *Id.* By signing the plea agreement, Petitioner agreed that he and Xina "possessed the eight kilograms of cocaine seized" that day in Utah and concealed their possession of it through Perez Jr. *Id.* at 9.

---

[4] *See Miranda v. Arizona*, 384 U.S. 436 (1966).

The plea agreement additionally provides that law enforcement lawfully seized and searched two DTO packages in April 2020. *Id.* at 6. The first contained approximately nine pounds of marijuana and approximately 237 grams of THC oil. *Id.* The second contained over 2,000 grams of THC oil. *Id.* On the day of, and the day following, the seizure of the packages, both Petitioner and Xina contacted FedEx and UPS multiple times regarding the packages and their whereabouts. *Id*. In May 2020, after learning of the interception of the two packages in April, Petitioner changed both his and Xina's phone numbers. *Id.* at 9.

Law enforcement also seized and searched, pursuant to sneak and peak warrants, two packages that Petitioner had mailed to a California source. *Id.* at 7. The packages were found to each contain $20,000 in U.S. currency meticulously hidden within the pages of magazines. *Id.* Although Petitioner used aliases and unrelated addresses to ship packages for the DTO, his involvement with the packages was confirmed by post office video surveillance, postal records, and court-ordered location data from tracking devices on Petitioner's vehicle and telephones. *Id.* From December 2019 to July 2020, Petitioner and Xina mailed at least 87 packages of bulk currency to California, each of which was believed to contain $20,000 in drug proceeds. *Id.* at 18. During that period, therefore, the DTO mailed approximately $1.7 million in drug proceeds to California. *Id.* at 18. After several packages containing tens of thousands of dollars in drug proceeds were presumed to have been stolen during the mailing process, the DTO began using couriers to deliver drug proceeds to California instead. *Id.* at 7.

Petitioner and Xina additionally oversaw a marijuana vape cartridge manufacturing operation at a co-defendant's residence. *Id.* at 6. At Petitioner's and Xina's direction, DTO members assembled thousands of

marijuana vape cartridges. *Id.* The DTO imported supplies for such assembly, including high end cartridge boxes and empty vape pens, which DHL discovered when it opened five packages destined for DTO-related addresses. *Id.* at 6, 10. Case agents estimate that the DTO imported at least 25,000 such cartridge boxes and empty marijuana vape pens. *Id.* at 6. A later search of the residence housing the vape cartridge manufacturing operation revealed, inter alia, bullet holes in the walls, filled marijuana vape cartridges, mail addressed to a co-defendant member of the DTO, plastic containers full of THC oil, firearms, extended magazines, rounds of live ammunition, and a cooler full of opiates. *Id.* at 10–11.

Case agents additionally obtained a search warrant for Petitioner's iCloud account, through which they discovered an email from a previous landlord expressing concern to Petitioner of potential "drug activity" at his residence. *Id.* at 10. Attached to the email was a photo of an oil filling machine, which markets at between $13,000 and $15,000 and is marketed to the Cannabis and CBD oil market for the automated filling of cartridges. *Id.*

Petitioner was also commonly seen coming and going from DTO stash houses around the time of suspected drug transactions, oftentimes carrying duffel bags or packages. *Id.* at 9, 12, 15. He was further placed at such stash houses with positional cell phone data. *Id.* at 13. A search of the garbage attributable to one such stash house revealed hundreds of vacuum seal bags smelling of marijuana. *Id.* at 12–13. Following the arrest of a DTO member at another stash house, law enforcement found thousands of both filled and empty THC vape cartridges, over a thousand grams of flower THC, thousands of THC edibles, firearms, and over a dozen cell phones. *Id.* at 15.

At Petitioner's own residence, he hired contractors to cement a large safe into the floor of the basement. *Id.* at 18. Although the residence was under the name of Petitioner's mother, he and Xina were the true owners of the property. *Id.* Law enforcement searched Petitioner's residence pursuant to a warrant in September 2020, at which time they discovered Petitioner, Xina, and several other co-defendants and DTO members in the residence. *Id.* They also discovered a money counter, over a dozen cell phones, a digital scale, various firearms and magazines, kilogram wrappings, vacuum seal bags, cocaine, assorted pills, and over $130,000 in cash. *Id.* at 18–19.

Confidential sources also verified Petitioner's involvement in the DTO. *Id.* at 20. The sources attested to Petitioner's having sold them various drugs including cocaine, heroin, and marijuana, as well as to having recruited them to sell drugs, receive drug packages, or manufacture vape cartridges. One stated that Petitioner brought roughly a thousand pounds of marijuana to Milwaukee from California each month. *Id.* Another stated that, after purchasing drugs from Petitioner on a regular basis, Petitioner asked him if he wanted to sell heroin. *Id.* That same source stated that he observed Petitioner using a blender to mix heroin and unpacking boxes of marijuana. *Id.* at 21. He also stated that he held onto guns for Petitioner and that he traveled to Chicago, Indiana, and Puerto Rico with Petitioner to obtain cocaine and to California to deliver drug proceeds. *Id.* at 21–22. Another source told law enforcement that an armed Petitioner blindfolded him, brought him down to his basement, and made the source try cocaine to prove he was not cooperating with law enforcement. *Id.* at 24. That source also stated that he helped Petitioner mix heroin with a cutting agent at a

DTO stash house, held onto guns for Petitioner, and accompanied him to California to purchase drugs. *Id.* at 24–25.

### 2.3 Plea Colloquy

At Petitioner's Rule 11 plea colloquy, Petitioner "agree[d] to the facts as summarized in the plea agreement." CR-ECF No. 379. He confirmed that he went over the agreement with Cafferty and that he was satisfied that he understood it. CR-ECF No. 639 at 8. He also stated that he reviewed and understood the elements of the offenses to which he was pleading guilty, and he agreed that the Government could prove those elements beyond a reasonable doubt. *Id.* at 10–11. Petitioner also confirmed that he was not forced, coerced, or threatened into entering his guilty plea. *Id.* at 16.

The court accordingly found that Petitioner was competent to enter a plea, that he understood his rights and the penalties involved, and that his plea was voluntary. CR-ECF No. 379.

### 2.4 Sentencing

Petitioner appeared for sentencing in April 2022. CR-ECF No. 640 at 1. At that time, Cafferty confirmed on Petitioner's behalf that Petitioner had no objection to the facts set forth in the revised presentence investigation report, which tracked the recitation of facts in the plea agreement. *Id.* at 3.

Cafferty sought a below-guidelines sentence. *Id.* at 7. He emphasized that Petitioner had accepted responsibility for the offenses and came from an "unsophisticated background" with "difficult family circumstances." *Id.* The Court imposed a twenty-one-year term of imprisonment. *Id.* at 21.

### 3. STANDARD OF REVIEW ON HABEAS

A person serving a sentence imposed by a federal court who is

claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws

Case 2:23-cv-00718-JPS   Filed 03/15/24   Page 10 of 23   Document 11

of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a). "Relief under § 2255 is available 'only in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice.'" *United States v. Coleman*, 763 F.3d 706, 708 (7th Cir. 2014) (quoting *Blake v. United States*, 723 F.3d 870, 878–79 (7th Cir. 2013)). "[W]here the motion, files, and records of the case conclusively show that the prisoner is entitled to no relief," the court need not hold an evidentiary hearing. *Torzala v. United States*, 545 F.3d 517, 525 (7th Cir. 2008) (quoting *Cooper v. United States*, 378 F.3d 638, 641–42 (7th Cir. 2004)).[5]

## 4. LAW & ANALYSIS

### 4.1 Ineffective Assistance of Counsel Generally

Courts apply the two-prong test, set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), to evaluate the effectiveness of counsel before trial, at trial, at sentencing, and on appeal. *See Makiel v. Butler*, 782 F.3d 882, 897 (7th Cir. 2015). "The Sixth Amendment guarantees a defendant the effective assistance of counsel at 'critical stages of a criminal proceeding,' including when he enters a guilty plea." *Lee v. United States*, 582 U.S. 357, 363 (2017) (quoting *Lafler v. Cooper*, 566 U.S. 156, 165 (2012) and citing *Hill v. Lockhart*, 474 U.S. 52, 58, 59 (1985)); *Eddmonds v. Peters*, 93 F.3d 1307, 1319 (7th Cir. 1996)).

---

[5]Such is the case here. Accordingly, the Court declines to hold an evidentiary hearing on this motion and instead disposes of it on the present record.

"A party asserting ineffective assistance of counsel bears the burden of establishing two elements: (1) that his trial counsel's performance fell below objective standards for reasonably effective representation, and (2) that counsel's deficiency prejudiced the defense." *Blake v. United States*, 723 F.3d 870, 879 (7th Cir. 2013) (citing *Strickland*, 466 U.S. at 687–88; *United States v. Jones*, 635 F.3d 909, 915 (7th Cir. 2011; and *Wyatt v. United States*, 574 F.3d 455, 457 (7th Cir. 2009)). "[A] court does not need to address the *Strickland* prongs in any particular order. If one prong is found to be insufficient, the court need not address the other one." *Ruhl v. Hardy*, 743 F.3d 1083, 1092 (7th Cir. 2014) (citing *Strickland*, 466 U.S. at 697).

With respect to the first prong, the *Strickland* standard is "'highly deferential' to counsel, presuming reasonable judgment and declining to second guess strategic choices." *United States v. Shukri*, 207 F.3d 412, 418 (7th Cir. 2000) (quoting *United States v. Williams*, 106 F.3d 1362, 1367 (7th Cir. 1997)). There is a "strong presumption" that counsel's decisions constitute reasonable litigation strategy. *Strickland*, 466 U.S. at 689 (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *United States v. Trevino*, 60 F.3d 333, 338 (7th Cir. 2005) ("[B]ecause counsel is presumed effective, a party bears a heavy burden in making out a winning claim based on ineffective assistance of counsel.").

The prejudice prong is not met merely by a showing that "counsel's errors might have had an effect on the outcome." *Ruhl*, 743 F.3d at 1091. Instead, there must be "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 1091–92. At the plea stage, specifically, *Strickland*'s prejudice prong requires the defendant to "show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty

and would have insisted on going to trial." *Hill*, 474 U.S. at 59; *Lafler*, 566 U.S. at 163 ("In the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice.") (citing *Missouri v. Frye*, 566 U.S. 134, 148 (2011) and *Hill*, 474 U.S. at 59).

"Counsel's work must be assessed as a whole; it is the overall deficient performance, rather than a specific failing, that constitutes the ground for relief." *Peoples v. United States*, 403 F.3d 844, 848 (7th Cir. 2005) (citing *Bell v. Cone*, 535 U.S. 685, 697 (2002); *Strickland*, 466 U.S. at 690; and *Holman v. Gilmore*, 126 F.3d 876, 881–84 (7th Cir. 1997)). Accordingly, although the Court below addresses Petitioner's ineffective assistance of counsel arguments individually for organizational purposes, the Court nevertheless considers Cafferty's performance holistically.

### 4.2    Ground One

As to Ground One, Petitioner alleges that Cafferty failed to investigate and introduce new evidence, failed to object to the drug quantities considered by the Court as relevant conduct under U.S.S.G. § 1B1.3, and failed to cross examine law enforcement and/or confidential informants regarding the quantities of drugs attributable to Petitioner. These contentions are meritless.

Petitioner's first contention fails because he fails to clarify what "new evidence" he believes Cafferty ought to have investigated and introduced. The Court declines to speculate as to what "new evidence" Petitioner might be referring.

His second contention fails because the parties, in a binding and valid plea agreement, agreed to recommend to the Court for sentencing purposes the specific drug quantities set forth in the plea agreement. If Cafferty were to have done what Petitioner now contends he was

ineffective for failing to do (challenge the drug quantities attributed to Petitioner), Cafferty likely would have breached the plea agreement.

"[I]t has long been the law in the Seventh Circuit . . . that the parties to a plea agreement are required to live up to the plea agreement's terms. Plea agreements are contracts." *United States v. Monti*, 477 F. Supp. 2d 943, 945 (N.D. Ill. 2007) (citing *Hartjes v. Endicott*, 456 F.3d 786, 790 (7th Cir. 2006) and *United States v. Salazar*, 453 F.3d 911, 913 (7th Cir. 2006)). "The government and the defendant must fulfill the agreement that was expressly or impliedly made between them." *Id.* (citing *United States v. Atkinson*, 259 F.3d 648, 654 (7th Cir. 2001) and *United States v. Schilling*, 142 F.3d 388, 394–95 (7th Cir. 1998)).

Counsel is not ineffective for declining to take a course of action that would have the effect of breaching a plea agreement into which the parties knowingly, voluntarily, and intelligently entered. *See Seavers v. United States,* No. 14-cv-835-JPG, 2014 U.S. Dist. LEXIS 148716, at *5–8 (S.D. Ill. Oct. 20, 2014) (rejecting as frivolous the petitioner's argument that counsel was ineffective for failing to argue against application of §2D1.1(b)(1) firearm enhancement since the petitioner validly entered into a plea agreement in which the parties agreed that the enhancement would apply).

 The plea agreement in this case reflected the parties' agreement that the Government had sufficient admissible evidence to prove that Petitioner was responsible for distributing the drug quantities set forth therein and that the parties would recommend to the Court that the relevant conduct attributable to him would track those drug quantities. CR-ECF No. 356 at 32, 36. As the Court discusses further below, *infra* Section 4.4, nothing in the record allows for the reasonable conclusion that Petitioner did not enter into the plea agreement knowingly, intelligently, and voluntarily. Cafferty

was therefore not ineffective for failing to reverse course and object to those drug quantities for U.S.S.G. § 1B1.3 purposes.

Petitioner's second contention also fails because at his Rule 11 plea colloquy, he explicitly "agree[d] to the facts as summarized in the plea agreement," which facts included a recitation of the drug quantities attributable to him. CR-ECF No. 379. By conceding those facts as set forth in the valid plea agreement and confirming having done so at his plea colloquy, Petitioner waived his opportunity to later dispute those facts. *United States v. Robinson*, 964 F.3d 632, 640 (7th Cir. 2020) ("[W]hen a defendant stipulates to conduct in a plea agreement, in a presentence report, and at his sentencing hearing, he waives any claim that he did not engage in that conduct.") (citing *United States v. Young*, 908 F.3d 241, 247 (7th Cir. 2018); *United States v. White*, 883 F.3d 983, 990 (7th Cir. 2018); and *United States v. Newman*, 148 F.3d 871, 876 (7th Cir. 1998)); *United States v. Lewis*, 162 F. App'x 647, 651 (7th Cir. 2006).

Representations made to a court during a plea colloquy are presumptively true, *Hurlow v. United States*, 726 F.3d 958, 968 (7th Cir. 2013) (quoting *United States v. Chavers*, 515 F.3d 722, 724 (7th Cir. 2008)), and Petitioner fails to rebut that presumption. *See also Key v. United States*, 806 F.2d 133, 136 (7th Cir. 1986) ("[T]he representations of the defendant [at a plea hearing] as well as any findings made by the judge accepting the plea[] constitute a formidable barrier in any subsequent collateral proceeding.") (quoting *Thompson v. Wainwright*, 787 F.2d 1447, 1460 (11th Cir. 1986)). Indeed, Petitioner does not now suggest that he lied to the court at his plea colloquy or that the plea agreement erroneously quantified the drug amounts attributable to him.

Petitioner's last contention—that Cafferty was ineffective for failing to cross examine law enforcement and/or confidential informants regarding the amount of drugs attributable to Petitioner—similarly fails. First, it is entirely unclear at what juncture or in what fashion Petitioner expects Cafferty to have engaged in "cross examin[ation]" of any witnesses in this case considering that Petitioner knowingly, intelligently, and voluntarily— and frankly, wisely—declined to go to trial. *See infra* Section 4.4; *see also* CR-ECF No. 639 at 15 (Q: "Do you understand that when you plead guilty, . . . you waive th[e] right to cross-examine . . . witnesses, to challenge them. Do you understand that?" . . . A: "Yes, your Honor."). Additionally, and as already noted above, the parties entered into a binding and valid plea agreement pursuant to which they agreed that specified drug quantities could be attributed to Petitioner for purposes of U.S.S.G. § 1B1.3, and Cafferty cannot be deemed ineffective for declining to engage in conduct or proffer argument that would run contrary to that agreement.

Additionally, even if Petitioner had hypothetically not agreed in his plea agreement that the drug quantities provided therein could be attributed to him for U.S.S.G. § 1B1.3 purposes, it still would have been a losing argument to attempt to challenge those drug quantities, and Petitioner does not suggest otherwise. "The 'Sixth Amendment does not require counsel . . . to press meritless arguments before a court,' . . . and it is always good strategy to avoid wasting time or the court's attention with claims that are going nowhere." *Peterson v. Douma*, 751 F.3d 524, 533 (7th Cir. 2014) (quoting *Lilly v. Gilmore*, 988 F.2d 783, 786 (7th Cir. 1993)); *Faucett v. United States*, 872 F.3d 506, 512 (7th Cir. 2017) ("Refraining from a meritless sentencing argument cannot be characterized as objectively unreasonable."). The plea agreement, criminal complaint, and revised

presentence report thoroughly recount the insurmountable evidence tying Petitioner to enormous quantities of drugs over a period of several years. Petitioner does not argue, and the record does not allow for the conclusion, that any attempt at challenging those drug quantities would have been successful. At sentencing, Petitioner himself described his involvement in drug trafficking as "out of control." CR-ECF No. 640 at 9. Accordingly, the Court will deny Ground One.

### 4.3    Ground Two

Next, Petitioner contends that Cafferty was ineffective for failing to challenge Count Six, which charged a violation of 18 U.S.C. § 924(c)(1)(A)(i). Specifically, Petitioner asserts that he was never in the presence of a firearm in furtherance of a crime.

This ground fails because Petitioner entered into a binding and valid plea agreement in which he agreed that he possessed firearms in furtherance of drug trafficking, and he later confirmed at his plea colloquy that the Government would be able to prove that fact beyond a reasonable doubt, so he cannot now dispute that conduct. *See Torzala*, 545 F.3d at 524 (noting that a petitioner gives up the ability to hold the government to its proof when he pleads guilty) (citing *United States v. Broce*, 488 U.S. 563, 571 (1989)).

But even if he had not so stipulated in a plea agreement and confirmed that stipulation at his plea colloquy, the record nevertheless refutes his claim that he was never in the presence of a firearm in furtherance of a crime. The record instead shows that during the relevant period he was, in fact, in the presence of multiple firearms, in furtherance of multiple crimes, at multiple points in time.

Certainly, "the mere presence of a firearm at the scene of a drug transaction" is, by itself, insufficient to support a § 924(c)(1)(A)(i) charge. *United States v. Vaughn*, 585 F.3d 1024, 1029 (7th Cir. 2009) (citing *United States v. Castillo*, 406 F.3d 806, 814–15 (7th Cir. 2005)). But the record in this case clearly demonstrates "through specific facts" that Petitioner was "tie[d] . . . to the firearm[s]" and that they were "possessed to advance or promote the criminal activity." *Castillo*, 406 F3d. at 814 (quoting H.R. Rep. 1997 WL 668339, at *11–12). It is apparent in this case that the § 924(c)(1)(A)(i) charge succeeded in its intention: "to reach weapons that actually facilitate crimes and not those innocently possessed in the vicinity." *Id.*

A search of Petitioner's and Xina's residence, at which time both they and other DTO members were present, revealed firearms in almost every room (five alone in Petitioner's bedroom) along with drugs and drug trafficking paraphernalia. CR-ECF No. 356 at 19. Multiple sources also informed law enforcement that Petitioner regularly carried guns, stored guns at DTO stash houses (at which drug packages were delivered), loaned guns to others (including to individuals he solicited to traffic drugs on his behalf), and had others hold onto guns for him. Another source told law enforcement that Petitioner wielded a firearm when he forced the source into the basement to try cocaine to prove he was not working with law enforcement, while another recounted that Petitioner told him that he participated in shootings involving suspected "snitches" as targets. *Id.* at 22. The evidence additionally shows that Petitioner oversaw the marijuana vape cartridge manufacturing operation at a co-defendant's residence, the search of which again revealed firearms in conjunction with drugs and drug paraphernalia. Considered together, the evidence recounted in the record

more than sufficiently supports the § 924(c)(1)(A)(i) charge against Petitioner. Accordingly, Cafferty was not ineffective for failing to challenge that charge, and so the Court will deny Ground Two.

### 4.4    Ground Three

Petitioner next contends that his due process rights were violated because he was confined for at least three months in solitary confinement and was unable to contact his attorney. He also contends that his guilty plea was involuntary, unintelligent, and unknowing because he never received a copy of it and was pressured into it. For the reasons discussed herein, this ground also fails.

A plea "operates as a waiver of important rights, and is valid only if done voluntarily, knowingly, and intelligently, 'with sufficient awareness of the relevant circumstances and likely consequences.'" *Bradshaw v. Stumpf*, 545 U.S. 175, 183 (2005) (quoting *Brady v. United States*, 397 U.S. 742, 748 (1970)). "[T]o satisfy due process a plea can be voluntary only if the accused 'received real notice of the true nature of the charges against him . . . ,'" including "aware[ness] of the . . . elements of the . . . charge." *Harvey v. McCaughtry*, 11 F.3d 691, 695 (7th Cir. 1993) (quoting *Henderson v. Morgan*, 426 U.S. 637, 645 (1976)) (cleaned up); *Bradshaw*, 545 U.S. at 182–83.

Petitioner does not clarify when he was allegedly confined or how this confinement somehow affected his plea decision. Further, his conclusory allegations regarding his plea are insufficient to demonstrate that it was involuntarily, unintelligently, and unknowingly made. Nothing in the record suggests that Petitioner's guilty plea was anything but knowing, intelligent, and voluntary. He contends that he never received a copy of his plea agreement, but this assertion conflicts with his statement at his plea colloquy that the signature on the plea agreement was his and that

he had reviewed the agreement with Cafferty. CR-ECF No. 639 at 7–8. Petitioner's responses at his plea colloquy more than sufficiently demonstrate that he understood the offenses to which he was pleading guilty, the elements of those offenses, and the implications of his plea. He does not now suggest that he lied at his plea colloquy. Accordingly, the record does not support Petitioner's claim that Cafferty was in any respect ineffective regarding Petitioner's guilty plea. The Court will therefore deny Ground Three.

### 4.5    Ground Four

Lastly, Petitioner alleges that Cafferty was ineffective for failing to move to suppress evidence going to Count One and for failing to seek testing of the purity of the drugs. Like the rest, this ground falls flat.

First, as to the deficiency prong of *Strickland*, Petitioner does not indicate on what basis he believes Cafferty should have sought to suppress any of the evidence in this case. As the Court has already noted, "[t]he 'Sixth Amendment does not require counsel . . . to press meritless arguments," and Petitioner does not even suggest, let alone argue, that there existed any valid basis to seek suppression of any evidence in his case. *Peterson*, 751 F.3d at 533 (quoting *Lilly*, 988 F.2d at 786).

Nor does Petitioner, turning to the prejudice prong, give the Court any reason to believe that seeking drug purity testing would have made any material difference in his case, let alone that "he would not have pleaded guilty and would have insisted on going to trial" if such testing had occurred. *Hill*, 474 U.S. at 59. As already noted, the record ties Petitioner to thousands of kilograms of drugs over the course of several years, so it is ludicrous for Petitioner to suggest that purity testing would have made any material difference in his defense. In any event, "[t]he particular type . . . of

[controlled substance] that a defendant possesses [is] not [an] element[] of [a] section 841 offense," *United States v. Kelly*, 519 F.3d 355, 363 (7th Cir. 2008) (citing *United States v. Gougis*, 432 F.3d 735, 745 (7th Cir. 2005) and *Knox v. United States*, 400 F.3d 519, 523 (7th Cir. 2005)), so there is no reason to believe that seeking purity testing of the drugs underlying Count One would have aided his defense to such an extent that Cafferty's failure to do so could constitute ineffective assistance of counsel. Accordingly, the Court will deny Ground Four.

**5. CONCLUSION**

Nothing in the record or in Petitioner's single form submission indicates that Cafferty performed deficiently, let alone that in the absence of any such alleged deficient performance, Petitioner would have opted to confront the Government at trial. *See Coleman v. United States,* 318 F.3d 754, 758 (7th Cir. 2003) (no ineffective assistance of counsel where counsel "tried to make the best of a bad situation for his client" and where, "[c]onsidering the underlying circumstances of the case, it would seem that [the defendant's] best option was to plead guilty"). Such a notion, when considered in conjunction with the beyond overwhelming and years'-long collection of evidence against Petitioner, simply denies reality. The Government had Petitioner, for lack of a better phrase, dead to rights. Accordingly, the Court will deny his § 2255 motion with prejudice.

The Court must address one additional matter. Under Rule 11(a) of the Rules Governing Section 2255 Cases, "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." To obtain a certificate of appealability under 28 U.S.C. § 2253(c)(2), "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or

wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). The petitioner "need not show he is likely to prevail, but he must show that 'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further.'" *Peterson v. Douma*, 751 F.3d 524, 528 (7th Cir. 2014) (quoting *Slack*, 529 U.S. at 484).

In light of the well-settled principles governing the disposition of Petitioner's grounds for relief, as outlined above, the Court cannot fairly conclude that reasonable jurists would debate whether his motion should be decided differently; as a consequence, the Court must deny him a certificate of appealability.

Accordingly,

**IT IS ORDERED** that Petitioner Louis Rey Perez, III's motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255, ECF No. 1, be and the same is hereby **DENIED**;

**IT IS FURTHER ORDERED** that a certificate of appealability be and the same is hereby **DENIED**; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED with prejudice.**

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 15th day of March, 2024.

BY THE COURT:

J. P. Stadtmueller
U.S. District Judge

This Order and the judgment to follow are final. A dissatisfied party may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **thirty (30)** days of the entry of judgment. See Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the thirty-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). Moreover, under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **twenty-eight (28)** days of the entry of judgment. The Court cannot extend this deadline. *See* Fed. R. Civ. P. 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The Court cannot extend this deadline. *See id.* A party is expected to closely review all applicable rules and determine all applicable rules and determine what, if any, further action is appropriate in a case.